IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 20, 2005 Session

## JOHN C. JOHNSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-D-2519      J. Randall Wyatt, Jr., Judge**

_____

**No. M2004-02675-CCA-R3-CO -Filed March 22, 2006**

_____

The petitioner, John C. Johnson, filed a petition for post-conviction relief and a petition for a writ of error coram nobis. After an evidentiary hearing, the post-conviction court denied the petition for post-conviction relief. The petition for writ of error coram nobis was dismissed without a full evidentiary hearing. In this consolidated appeal, the petitioner challenges the post-conviction court's rulings on both petitions.[1] Upon our review of the record and the parties' briefs, we affirm the dismissal of the petition for a writ of error coram nobis. However, we reverse the denial of post-conviction relief and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part, Reversed in Part, and Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Wendy S. Tucker, Nashville, Tennessee, for the appellant, John C. Johnson.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Katrin Novak Miller and Bret Gunn, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

On November 1, 1999, the petitioner was convicted of second degree murder, facilitation of aggravated kidnapping, and especially aggravated robbery. The trial court sentenced the petitioner to a total effective sentence of thirty years. On direct appeal, this court reversed the trial court's imposition of consecutive sentencing and remanded for a new sentencing hearing. See State v. John

_____

[1] The petitioner's post-conviction and error coram nobis appeals were consolidated by the order of this court.

Charles Johnson, No. M2000-00529-CCA-R3-CD, 2001 WL 208512, at *1 (Tenn. Crim. App. at Nashville, Mar. 1, 2001).  On remand, the trial court again imposed consecutive sentencing and a total effective sentence of thirty years.  This court affirmed the sentence on appeal.  See See State v. John Charles Johnson, No. M2001-01567-CCA-R3-CD, 2002 WL 533946, at *1 (Tenn. Crim. App. at Nashville, Apr. 10, 2002).  Thereafter, the petitioner filed a petition for post-conviction relief, alleging ineffective assistance and prosecutorial misconduct,  and a petition for a writ of error coram nobis, alleging newly discovered evidence.  For context, we will first recount the evidence at trial.

## A.  Trial

In summary, the proof at trial revealed that on the afternoon of August 16, 1998, the petitioner and Jeremiah Hailey, a co-defendant, began drinking heavily.  Sometime after midnight, a discussion ensued regarding Hailey's ex-brother-in-law, Joe Dotson.  Hailey told the petitioner that his sister and Dotson had divorced, but they were planning to reconcile even though Dotson was physically abusive.  Hailey suggested to the petitioner that they should kill Dotson, and the petitioner agreed.  Using the pretext of buying a stolen car from some Mexicans, Hailey and the petitioner lured Dotson to Old Hickory Lake.  While there, Hailey fired multiple shots at Dotson, hitting him twice.  Dotson jumped into the lake, and the petitioner followed him.  According to Hailey, the petitioner held Dotson face-down under the water until Dotson stopped moving.  Hailey and the petitioner decided to move Dotson's body to the other side of the lake where the current from the river would carry the body away.  The men maneuvered the body into the trunk of the petitioner's car, drove to the other side of the lake, and dumped the body into the river.  Hailey stated that the petitioner had taken some money from Dotson's sock prior to dumping the body.  The petitioner shared the money with Hailey.

Because they were the last people to see Dotson alive, the petitioner and Hailey were questioned by police.  They became suspects in the murder when their stories regarding meeting the Mexicans that night had major inconsistencies.  Police searched the petitioner's car and discovered blood spatter in the trunk.  The spatter covered most of the interior of the trunk; however, there was no blood on the inside lid of the trunk.  Dr. John E. Gerber, who performed the autopsy on the victim, testified that due to the distances reached by the blood spatter, he believed that Dotson was alive when he was in the trunk.  Dr. Gerber stated that if Dotson had not been alive, there would have been insufficient blood pressure to account for the extensiveness of the blood spatter.

The petitioner testified that he did not kill the victim and had no foreknowledge of Hailey's plan to kill the victim.  The petitioner acknowledged that he drove Hailey and the victim to the lake to meet some Mexicans about a car.  While there, the victim complained when the Mexicans failed to arrive.  Hailey uttered a vulgarity and threatened to kill the victim.  Hailey shot the victim, and the victim ran into the lake.  The petitioner said that he went into the lake to pull the victim from the water.  The victim was not moving, and the petitioner believed him to be dead.  Hailey told the petitioner that they were not going to leave the body at that location.  Frightened of Hailey, the petitioner helped Hailey load the body into the trunk.  While loading the body, money fell from the

victim's sock. Hailey picked up the money. The petitioner and Hailey dumped the body in the river. While driving home, Hailey gave half of the money to the petitioner. The petitioner took the money but later threw it from his car window.

## B. Post-Conviction

The petitioner's trial counsel was the first witness to testify at the post-conviction hearing. Trial counsel recalled that he met with the petitioner and various members of the petitioner's family several times prior to trial. Counsel testified that the petitioner consistently denied knowing that Hailey planned to kill the victim. However, the petitioner admitted that he went into the lake with the victim, and he helped dispose of the body.

Trial counsel stated that he had talked with the petitioner's family about hiring an investigator. He provided the names of two investigators, Charlie Grigsby and Scott Suffrage. The family hired Suffrage. Counsel did not pay Suffrage but assumed that the family had paid him. Counsel said that he would not dispute that he later told the family that they could "write off" the money they paid Suffrage because he was going through a difficult divorce and would not perform the investigative services. However, counsel had no independent recollection of making such a statement. Trial counsel said that no other investigator was hired. Regardless, counsel concluded that an investigator would have been only marginally helpful since there was no issue as to whether the petitioner was present during the murder; the only question was the petitioner's knowledge of and participation in the plan to kill the victim.

Trial counsel stated that the petitioner gave him the names of four to six individuals who he believed would be helpful to his case. Counsel attempted to contact each of the individuals. Counsel recalled that he was unable to contact all of the individuals, and some of those contacted informed him that their testimony could possibly hurt the petitioner's case. Counsel stated that "the other people I talked to were either non-committal or non-helpful." Trial counsel did not recall the petitioner mentioning that his mother, Yvonne Moles; his aunt, Barbara Callis; or his uncle, Nick Callis, would testify about seeing the petitioner and his co-defendant Hailey in the afternoon prior to the murder.

Trial counsel said that he considered calling Detective E.J. Bernard to testify that Hailey had lied to Bernard. However, counsel admitted that both Hailey and the petitioner had lied to police in their initial statements about the murder.

Counsel recalled that Detective Bernard had taken the petitioner for a polygraph examination after the petitioner came into the police station. During preparation for the polygraph, the petitioner made incriminating statements regarding his involvement in the murder. As a result, the petitioner became a suspect instead of a witness. The petitioner never told counsel that Detective Bernard prevented him from leaving the police station prior to the polygraph and before he made the incriminating statement. The petitioner never told counsel that he asked Detective Bernard for an

attorney but was denied counsel. Counsel testified that he did not file a motion to suppress the petitioner's statement because he thought there was no legitimate legal basis for such a motion.

Trial counsel asserted that he had a "real heart to heart" with the petitioner about whether he should testify at trial. Counsel had reservations about the petitioner testifying, but the petitioner felt compelled to tell the jury his version of events. Counsel anticipated that during direct examination he would ask the petitioner about his version of events; therefore, he and the petitioner "went over the facts as he related them, many times." Counsel conceded that he did not review potential cross-examination questions with the petitioner. The petitioner decided to testify on the day of trial.

Trial counsel recalled that the victim's sister, Sheila Atworth, testified at trial that the victim's wife committed suicide at the scene of the victim's murder one year after his death.[2] Counsel said that a "big discussion" took place regarding the admissibility of Atworth's testimony. Counsel surmised that if the discussion was not in the trial transcript, the discussion did not take place, or it had taken place outside the courtroom. Counsel stated that if he did not object to Atworth's testimony, he should have. Regardless, counsel opined that Atworth's testimony was "pretty irrelevant" and would not have changed the jury's verdict.

Trial counsel testified that Hailey's plea agreement required him to testify against the petitioner at trial. Counsel recalled that on the morning of trial, Hailey was reluctant to testify against the petitioner. However, after speaking with the prosecutors and his attorney, Hailey agreed to testify. The petitioner was very upset and told counsel that he believed the State had threatened Hailey, forcing him to testify. Counsel did not recall the petitioner saying that Hailey had told the State his testimony would not be truthful. Counsel did not inform the court that Hailey was pressured to testify because counsel believed that the State had the right to revoke Hailey's plea agreement if he did not comply with the terms of the agreement. At trial, Hailey testified that he and the petitioner entered into a plot to kill the victim, and, while at the lake, the petitioner held the victim's head under the water to drown him. Counsel stated that the jury was aware that Hailey was testifying pursuant to a plea agreement. Counsel opined that Hailey's testimony was devastating to the petitioner. However, counsel said that the State could have possibly obtained a conviction without Hailey's testimony, due in part to the presence of the victim's blood in the trunk of the petitioner's car.

Counsel stated that he asked the trial court to instruct the jury on the lesser-included offense of voluntary manslaughter; however, the trial court refused. Counsel did not request an instruction on the lesser-included offenses of reckless homicide, facilitation of reckless homicide, criminally negligent homicide, or facilitation of criminally negligent homicide. Counsel explained, "The way I understood it is that it is a linear progression. So if they're not going to charge involuntary (sic) manslaughter, they're not going to charge any of the other lessers." The failure to charge lesser-included offenses other than voluntary manslaughter was not raised at the motion for new trial or on appeal.

---

[2] The trial transcript refers to the witness as "Sheila Ashworth."

Counsel stated that he did not meet with the petitioner after the petitioner's sentencing hearing or after the motion for new trial. He did not discuss potential appellate issues with the petitioner.

Yvonne Callis Moles, the petitioner's mother, testified that prior to trial, counsel suggested that Suffrage be hired as an investigator. Moles' father paid Suffrage five hundred dollars. Moles never met with Suffrage, and she was not aware of any work that Suffrage did on the petitioner's case. When Moles complained to trial counsel about Suffrage, counsel told her to just "throw that money out the window" because Suffrage was going through a bad divorce and would not do any more work. Moles stated that the family did not hire another investigator.

Moles told trial counsel that on the day the victim was killed, the petitioner and Hailey came to her house in the "late afternoon." Moles said that the petitioner was acting normally, but Hailey "acted so out of character. He was talking real quiet, almost in an endearing type – he was holding our hands." Hailey had been drinking, and his behavior made Moles uncomfortable. Moles told counsel that she wanted to testify at trial regarding what she saw. Counsel told her, "I don't know, we'll see." Counsel did not call Moles to testify at trial.

Moles stated that she also told counsel that she wanted to testify at the petitioner's sentencing hearing. Moles explained that she could have testified regarding the petitioner's work history and character. Counsel again said, "[W]e'll see." Counsel did not call Moles to testify at the petitioner's sentencing hearing.

Barbara Ann Callis, the petitioner's aunt, testified that she saw the petitioner and Hailey at Moles' house on the day of the murder. Callis stated that the petitioner acted normally. Callis stated that she had never met Hailey until that day. Callis asserted that Hailey was "not at all coherent," and his eyes were red and bloodshot. Hailey was also pacing and "acting nervous-like." Callis testified that she never really discussed her observations with anyone involved in the petitioner's case. Callis stated that she did not testify at the petitioner's trial.

Dan G. Hodges testified that he was an investigator who had been hired by the petitioner for the post-conviction proceeding. Hodges attempted to interview Hailey concerning the petitioner's case. Hailey, who was incarcerated in Riverbend Maximum Security Prison, refused to speak with Hodges until the petitioner's counsel spoke with Hailey and Hailey's attorney. The petitioner's counsel mailed Hailey a list of questions. Hailey refused to respond to the questions in writing; however, he verbally responded to the questions posed by Hodges. Hodges wrote down the answers to the questions, and Hailey signed the statement as true and accurate. Hailey told Hodges that the petitioner knew that Hailey had a gun; however, Hailey did not believe the petitioner knew he had the gun to kill Dotson. Hailey stated that he saw the petitioner go into the water with the victim, but he did not see the petitioner hold the victim's head underwater. Hailey said that he gave a statement to police incriminating the petitioner because he believed the petitioner was telling police that Hailey killed the victim. Hailey said that he testified against the petitioner after being told by the State that

if he refused, he would go to jail for life. Hailey stated that he would not testify regarding his current version of events.

The petitioner testified at the post-conviction hearing. The petitioner stated that prior to his arrest, police asked if he would agree to take a polygraph examination. The petitioner asserted that halfway through the preparation for the polygraph, he changed his mind and decided not to take it. When the petitioner attempted to leave, Detective Bernard prevented him from leaving. The petitioner told Detective Bernard that Detective Putnam told him that he could leave whenever he chose. The petitioner stated that if he could not leave, he wanted an attorney. Detective Bernard told the petitioner that he had to get permission from Detective Putnam before the petitioner could leave. The petitioner was quiet and upset. Detective Bernard continued to talk to the petitioner, saying that the petitioner did not have to worry if he had done nothing wrong. The petitioner then gave Detective Bernard an incriminating statement. The petitioner contended that he would not have given an incriminating statement if he had been allowed to leave. He also stated that he would have utilized the services of an attorney had one been provided. The petitioner alleged that police did not discover the blood spatter in his car until after he made his incriminating statement. The petitioner claimed that prior to his statement the police had no reason to look into his car. The petitioner conceded that his statement to Detective Bernard was substantially similar to his trial testimony.

The petitioner stated that when he first hired trial counsel, counsel told him not to reveal to the public defender's office that he had hired counsel. Counsel explained to the petitioner that he wanted the public defender's office to do most of his "legwork" for him.

The petitioner testified that counsel represented him for approximately one year prior to trial. During that time, the petitioner and counsel met six times, including the intake interview. The petitioner felt that he had insufficient contact with trial counsel, noting that he or his parents often tried unsuccessfully to contact trial counsel. The petitioner said that he was shown discovery materials one month prior to his trial, but he did not see the statements that he and Hailey made to police until the Friday before trial.

The petitioner acknowledged that he and trial counsel discussed whether the petitioner would testify. The petitioner claimed that he was reluctant to testify, but trial counsel told him that he would look guilty if he did not testify. However, counsel told the petitioner that the decision whether to testify was the petitioner's. The petitioner maintained that he and trial counsel never discussed the substance of his trial testimony. The petitioner complained that the only preparation he received prior to testifying was counsel's advice to use correct English.

The petitioner asserted that he wanted numerous family members and friends to testify at his trial. The petitioner's family members would have testified that they saw the petitioner and Hailey the afternoon of the murder, and the other individuals would say that they saw the petitioner and Hailey drinking at a club before the murder. The petitioner maintained that his parents were adamant about testifying. Counsel told the petitioner that "we'd see how it worked out." None of the witnesses requested by the petitioner testified at trial. The petitioner asked trial counsel if he had

contacted any of these individuals. Trial counsel responded that he had tried but was unable to contact any of the witnesses.

After his family hired Suffrage, the petitioner met Suffrage one time for ten minutes, then he never saw him again. The petitioner's parents told him that Suffrage was having marital problems and had left town without performing the work for which he was hired.

The petitioner testified that on the day of his trial, he was in the courtroom when Hailey was brought in. Hailey said that he did not want to testify against the petitioner. A recess was called, and the petitioner was placed in a room adjacent to the room where the State spoke with Hailey. The petitioner said that the walls were thin, and he was able to hear the conversation. The prosecutors asked Hailey why he did not want to testify. Hailey responded that his testimony "wasn't entirely truthful." The prosecutors warned Hailey that if he did not testify "they were going to bring him back a couple of months down the road and give him life." The petitioner claimed the prosecutors also told Hailey that the petitioner would "walk" if Hailey did not testify. Hailey asked the prosecutors if he could return to the penitentiary where he had been housed. The prosecutors refused, saying that they would send Hailey to the local jail where everyone knew that he was supposed to testify against the petitioner. Hailey returned to the courtroom, still reluctant to testify. However, after speaking with his attorney, Hailey testified against the petitioner.

The petitioner stated that prior to Hailey's testimony, he informed trial counsel about the conversation between Hailey and the State. The petitioner told counsel, "I know that's not right, he can't do that." The petitioner said that counsel seemed as enthusiastic as the petitioner about the turn of events. However, counsel never advised the trial court that Hailey had been pressured to testify. Additionally, trial counsel never cross-examined Hailey about his reluctance to testify or about the untruthfulness of his testimony.

The petitioner testified that he did not see or speak with trial counsel between the trial and the sentencing hearing. The day of the sentencing hearing, the petitioner reiterated to counsel that he wanted his parents to testify at the sentencing hearing. The petitioner wanted his parents to testify regarding his character and certain discrepancies in his presentence report. Trial counsel said, "I'm not sure about it, we'll see." The petitioner's parents were not called as witnesses at his sentencing hearing. However, the petitioner admitted that during his testimony at the sentencing hearing, he talked about "some" of the topics he had wanted his parents to cover.

At the sentencing hearing, the petitioner again complained to trial counsel about the State's prosecutorial misconduct with Hailey. The petitioner wanted trial counsel to raise the issue on appeal. However, trial counsel did not raise prosecutorial misconduct on direct appeal. The petitioner asserted that he did not see trial counsel between the sentencing hearing and the appeal; however, trial counsel sent him a copy of his appellate brief.

Bret Gunn, an assistant district attorney who helped to prosecute the petitioner, testified that on the day of the petitioner's trial, Hailey was reluctant to testify against the petitioner because they

-7-

were friends. Hailey never intimated that his trial testimony would be untruthful. Gunn informed Hailey that his plea agreement was contingent upon his testimony against the petitioner, and, if Hailey did not testify, the State could revoke his plea agreement and proceed on the first degree murder charge. Gunn also warned Hailey that if he were convicted of first degree murder, he would receive a life sentence. Gunn testified that he would have prosecuted the petitioner without Hailey's testimony and would have tried Hailey later. Such an alternate course was not needed because Hailey decided to testify against the petitioner.

Edward M. Yarbrough, Hailey's attorney, testified that Hailey pled guilty to second degree murder and agreed to testify against the petitioner in exchange for a thirty-year sentence. Hailey never indicated to Yarbrough that his statement to police or his trial testimony was untruthful, but he was reluctant to testify against the petitioner because they were friends. Hailey's plea agreement was contingent upon him testifying to the truth, and everyone believed the truth was the version of events he told Detective Bernard. Hailey's trial testimony was substantially the same as his statement to Detective Bernard.

The final witness at the post-conviction hearing was Detective E.J. Bernard with the Metropolitan Nashville Police Department. On August 17, 1998, Detective Bernard was called in to administer a polygraph examination to the petitioner. He stated that at the time of the polygraph, the petitioner was considered a witness in the murder, not a suspect. No Miranda warnings were given, but Detective Bernard had the petitioner sign a release indicating that he was aware that the doors were not locked, he was free to leave, and he was free to consult with an attorney. The petitioner never asked to leave and never requested an attorney. Prior to the polygraph, the petitioner gave information to Detective Bernard indicating his involvement in the murder. At that point, Detective Bernard contacted Detective Brad Putnam who was in charge of the investigation. Detective Putnam took the petitioner upstairs, advised him of his Miranda rights, and took the petitioner's statement. In his statement, the petitioner denied knowing that Hailey planned to kill the victim; however, he admitted that he was present during the murder. Detective Bernard did not recall telling trial counsel that Hailey had lied to him.

At the conclusion of the post-conviction hearing, the post-conviction court denied the petition for relief. On appeal, the petitioner challenges the post-conviction court's ruling.

C. Writ of Error Coram Nobis

On February 17, 2004, the petitioner filed a petition for a writ of error coram nobis, alleging that after trial, Hailey "admitted that he was untruthful in his testimony, that [the petitioner] did not participate in any plan to kill the victim and that [the petitioner] did not know about that plan." The petitioner contended that Hailey had recanted his testimony, and the newly discovered evidence entitled him to a writ of error coram nobis. In response, the State filed a motion to dismiss, alleging that the petition was filed outside of the statute of limitations.

The trial court held a hearing on the State's motion to dismiss. At the hearing, the petitioner's post-conviction counsel, Wendy S. Tucker, testified that she was first retained to represent the petitioner when this court remanded the petitioner's case to the trial court for a determination on the propriety of consecutive sentencing. Subsequently, the petitioner's family retained Tucker to represent the petitioner in his post-conviction proceeding. The petitioner's post-conviction petition was required to be filed in August 2002. In May 2002, while working on the post-conviction petition, Tucker became concerned that she needed to speak with Hailey regarding post-conviction issues because she believed that some of the evidence at trial suggested Hailey was not truthful during his trial testimony.

Later that month, Tucker contacted Yarbrough, Hailey's trial attorney, for permission to speak with Hailey. Yarbrough stated that he no longer represented Hailey, who was incarcerated at Riverbend Maximum Security Prison.

On June 4, 2002, Tucker hired Hodges as an investigator and sent him to speak with Hailey. Hailey refused to speak with Hodges. On June 25, 2002, Tucker sent a letter to Hailey, explaining that she represented the petitioner and had hired Hodges. Tucker asked Hailey to tell the truth about the petitioner's involvement in the crime. Tucker stated that the letter was not returned, and she assumed that Hailey received the letter. Two weeks later, on July 19, 2002, Tucker gave birth to a daughter. The statute of limitations on the post-conviction action was quickly approaching; therefore, Tucker filed the post-conviction petition on July 24, 2002, even though she had not been contacted by Hailey.

Tucker testified that on April 16, 2003, she had yet to hear from Hailey, so she requested that Hodges again visit Hailey. That same day, she sent another letter to Hailey, asking for his help and explaining that she only wanted to hear the truth about the murder. Hailey told Hodges that he would answer Tucker's questions. However, Hailey stated that "[h]e would not testify, but he would answer, in writing, if [Tucker] would write out the questions, leave space, and leave a signature line, that he would answer the questions."

On May 5, 2003, Tucker sent a list of questions to Hailey. On September 26, 2003, Hodges went to visit Hailey and wrote the answers to the questions. Hodges returned Hailey's responses to Tucker shortly thereafter. Tucker filed the petition for writ of error coram nobis five months later. She explained that she waited five months because she originally believed that the issue could be part of the post-conviction petition. She said that in preparing for the post-conviction proceeding, she "realized that there was this thing out there called Writ of Error Coram Nobis that it, actually, fell under more succinctly than a Post-Conviction Petition. And that's when I filed that writ."

At the conclusion of the motion to dismiss the petition for writ of error coram nobis, the trial court determined that the petition had been filed four years outside of the statute of limitations. After reviewing the petition, the court found that due process did not require tolling the statute of limitations. On appeal, the petitioner contests this ruling and requests that we remand the petition for writ of error coram nobis for an evidentiary hearing.

## II. Analysis

### A. Post-Conviction

On appeal, the petitioner raises several issues for post-conviction relief. Namely, the petitioner contends that he received ineffective assistance of counsel, the State committed prosecutorial misconduct, and the trial court should have instructed the jury on all of the lesser-included offenses of first degree murder.

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the trial court as the trier of fact. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the trial court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

### 1. Ineffective Assistance of Counsel

First, we will address the petitioner's claim that he received ineffective assistance of counsel. When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Moreover, because the petitioner must establish both prongs of the test, this court need not address both prongs if the petitioner has failed to establish either component. Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

The petitioner raises several instances of ineffective assistance, specifically:

> 1. Counsel failed to file and pursue a motion to suppress the petitioner's statements to police;

-10-

2. Counsel failed to adequately investigate prior to trial and present all relevant witnesses at trial;

3. Counsel failed to consult with the petitioner and prepare him for trial;

4. Counsel failed to object to testimony relating to the suicide of the victim's wife;

5. Counsel failed to object to Dr. Gerber's testimony regarding blood spatter evidence;

6. Counsel failed to adequately cross-examine the petitioner's co-defendant, Hailey;

7. Counsel failed to request all lesser-included offenses and preserve the issue on appeal;

8. Counsel failed to prepare for and conduct the petitioner's sentencing hearing;

9. Counsel failed to consult with the petitioner regarding his appeal and failed to preserve the appropriate issues; and

10. Counsel's cumulative errors prejudiced the petitioner.

First, we will address the petitioner's complaint regarding counsel's failure to file a motion to suppress his statements to police. Our review of the record reveals that the petitioner voluntarily went to the police station and gave his first statement to Detective Putnam. In his statement, the petitioner admitted that he was one of the last people to see the victim alive before the murder. The petitioner told the detective that he, the victim, and Hailey were at the lake to meet some Mexicans about a car for sale. The petitioner maintained that the meeting ran long, and he and Hailey left the victim at the lake with the Mexicans. The petitioner claimed that the victim knew at least one of the Mexicans and planned to get a ride home with them. Detective Putnam asked the petitioner if he would take a polygraph examination regarding his statement, and the petitioner agreed.

Detective Bernard was brought in to conduct the polygraph examination. Detective Bernard testified at the post-conviction hearing that the petitioner was not a suspect at the time of the polygraph; accordingly, he was not advised of his Miranda rights. However, Detective Bernard asserted that in the course of executing a waiver form relating to the polygraph examination, he advised the petitioner that he was free to leave, he was not under arrest, and he was allowed to consult an attorney. Detective Bernard maintained that during the preparation for the polygraph, "[h]e gave me various information indicating that he was involved in the actual murder." There is

nothing in the record to reflect the exact nature of the petitioner's statements to Detective Bernard. After the petitioner gave inculpatory information to Detective Bernard, the detective took the petitioner back to Detective Putnam. Detective Putnam read the petitioner his Miranda rights, and the petitioner gave a statement indicating that while he did not know that Hailey intended to kill the victim, he was present when Hailey shot the victim, and he helped Hailey drag the victim from the lake to the trunk of his car for disposal of the body.

At the post-conviction hearing, the petitioner alleged that prior to making the inculpatory statements to Detective Bernard, he tried to leave the police station, but Detective Bernard prevented him from leaving. Additionally, the petitioner contended that he asked Detective Bernard to provide him an attorney, which request the detective denied. Detective Bernard testified that the petitioner never tried to leave and never asked for an attorney. The petitioner's trial counsel testified that the petitioner never told him that he tried to leave or that he asked for an attorney. Trial counsel could not recall the petitioner requesting that counsel file a motion to suppress his statements. Further, trial counsel testified that he did not file a motion to suppress the petitioner's statement. Counsel stated that he would have filed a motion to suppress if he had thought there was a legitimate legal basis for such a motion. The post-conviction court found that counsel made an informed, tactical decision not to file a motion to suppress. It is well-established that a reviewing court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). On appeal, we can find no evidence to preponderate against the post-conviction court's findings.

The petitioner also contends that counsel was ineffective in failing to adequately prepare for trial and was ineffective during trial. Specifically, the petitioner complains that counsel did not hire an investigator, did not call members of the petitioner's family to testify at trial, did not call Detective Bernard to testify that Hailey had lied to him, did not interview Hailey prior to trial, and did not adequately cross-examine Hailey.

At the post-conviction hearing, the petitioner's trial counsel recalled that Suffrage, the investigator hired by the petitioner's family, did not fully perform the investigation he was hired to conduct. Counsel acknowledged that investigation is an important part of a murder case and that he did not hire another investigator. Counsel opined that an investigator would have been only marginally helpful because the petitioner did not deny that he was present during the murder; he only denied foreknowledge of the plan to kill the victim. Counsel's informed, tactical decision on this issue will not be second-guessed. The petitioner has failed to show how the failure to hire an investigator prejudiced him. At best, the petitioner merely speculates as to how further investigation would have been beneficial.

The petitioner also complains that counsel failed to call his parents, his aunt, and his uncle to testify at trial that they had seen the petitioner and Hailey the afternoon of the murder. The petitioner alleges that his family would have testified that he was behaving normally while Hailey was behaving strangely. Counsel asserted that he was comfortable with his preparation for trial.

Counsel testified that he did not recall the petitioner requesting that he interview his family members about seeing the petitioner and Hailey the afternoon of the murder. Regardless, counsel spoke with the petitioner's parents on several occasions. Counsel stated that he interviewed numerous witnesses in preparation for trial. One of the witnesses told counsel that he would be detrimental to the petitioner's case. Additional witnesses were "either non-committal or non-helpful." Further, counsel noted that the petitioner's family members were not present immediately prior to or during the killing.

Initially, we note that the petitioner did not present his father or his uncle to testify at the post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit these witnesses might have offered to the petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id. Regarding the petitioner's mother and aunt, the post-conviction court determined that counsel adequately investigated the case and made an informed decision as to when to call witnesses. The evidence does not preponderate against the post-conviction court's findings.

The petitioner complains that counsel did not call Detective Bernard to testify that Hailey had lied to him. At the post-conviction hearing, Detective Bernard testified that he did not recall telling the petitioner's trial counsel that Hailey had lied. However, he admitted that both the petitioner and Hailey were untruthful with police, each initially relating a contrived story involving Mexicans to explain the victim's death. Counsel testified that he spoke with Detective Bernard regarding the case because he believed that Detective Bernard stated that Hailey had lied. Counsel did not call the detective as a witness at trial. The post-conviction court found that counsel made a reasonable, tactical decision to not call Detective Bernard at trial. The evidence does not preponderate against the court's finding. Moreover, we note that calling Detective Bernard to testify about the conflicting statements given by both Hailey and the petitioner could have hurt the petitioner as much as helped him. Therefore, we conclude that the petitioner has failed to demonstrate prejudice.

The petitioner contends that counsel failed to interview Hailey prior to trial and failed to adequately cross-examine Hailey. The petitioner contends that Hodges' testimony concerning Hailey's subsequent version of events demonstrates counsel's ineffectiveness. At the post-conviction hearing, counsel testified that prior to trial, he contacted Hailey's attorney, Yarbrough, about speaking with Hailey. However, the interview never took place. Counsel acknowledged that he did not ask Hailey about his reluctance to testify against the petitioner.

Yarbrough testified that Hailey was reluctant to testify against the petitioner because they were friends. Hailey never told Yarbrough that his testimony was untruthful. Yarbrough asserted that Hailey's plea agreement was contingent on him testifying truthfully at the petitioner's trial. Additionally, prosecutor Bret Gunn testified that he did not need Hailey's testimony to convict the petitioner. Gunn stated that Hailey never indicated that his trial testimony was untruthful; he was merely hesitant to testify against his friend.

-13-

Hodges testified that he spoke with Hailey several years after the trial. During Hailey's conversation with Hodges, Hailey indicated that the petitioner did not know about the plan to kill the victim. Hailey also indicated that while he saw the petitioner in the water with the victim, he did not specifically see the petitioner hold the victim's head under the water. Hailey told Hodges that he was telling the truth, but he would not testify in court regarding his recent version of events.

The post-conviction court found that trial counsel had questioned Hailey about his plea agreement. During his testimony, Hailey acknowledged that he was testifying as a condition of his plea agreement. Further, Hailey said that the State required him to testify truthfully. The post-conviction court stated that the extent of cross-examination is a tactical decision that is not to be second guessed. The evidence does not preponderate against this finding.

The petitioner complains that counsel did not adequately consult with him or prepare him to testify at trial. The petitioner testified that counsel met with him only six times in preparation for trial. The petitioner asserted that counsel waited until the Friday before trial to show him the statements that he and Hailey made to police. The petitioner claimed that counsel did not discuss with the petitioner his trial testimony other than to advise the petitioner to use correct English.

Counsel testified that he did not know precisely how many times he met with the petitioner prior to trial, but he recalled that he met with the petitioner and his family frequently. Counsel acknowledged that he did not review potential cross-examination questions with the petitioner. Counsel could not recall if he reviewed with the petitioner the questions he would ask during direct examination. However, counsel stated that he and the petitioner frequently reviewed the facts as the petitioner recalled them. Counsel stated that he planned to ask the petitioner about his version of the facts on direct examination. The post-conviction court found that the petitioner failed to establish that counsel was ineffective in his consultation with and preparation of the petitioner. The evidence does not preponderate against this finding.

Next, the petitioner argues that trial counsel was ineffective in failing to object to the testimony of Sheila Atworth. Trial counsel testified that at trial Atworth testified that the victim's wife committed suicide at the scene of the victim's murder one year after his death. Counsel maintained that a discussion regarding Atworth's testimony took place, explaining that it might not be reflected in the trial transcript. Counsel opined that Atworth's testimony was irrelevant to the petitioner's guilt, and he should have objected to it. Regardless, counsel opined that the testimony would not have affected the jury's verdict. The post-conviction court found that while Atworth's testimony did not help the petitioner's case, the outcome of the trial was unaffected by the testimony. As such, the petitioner failed to establish prejudice. We agree with the post-conviction court.

As his next issue, the petitioner maintains that counsel was ineffective in failing to object to the testimony of Dr. John E. Gerber, the medical examiner, as to the meaning of blood spatter in the trunk of the petitioner's car. At trial, Dr. Gerber testified that the span of the blood spatter in the petitioner's trunk indicated that the victim was alive when he was in the trunk. He reached this conclusion because a certain amount of blood pressure would be necessary for the blood to spatter

to the distances found in the trunk. At the post-conviction hearing, trial counsel acknowledged that Dr. Gerber was designated an expert in forensic pathology; however, he was not designated an expert in blood spatter analysis. The post-conviction court found that trial counsel elicited testimony from Dr. Gerber at trial indicating that blood spatter analysis is an inexact science. Further, the court found that counsel effectively cross-examined Dr. Gerber, determining that counsel's failure to object did not prejudice the petitioner. We conclude that Dr. Gerber's testimony fell within his purview as a forensic pathologist. Therefore, trial counsel was not ineffective in this regard.

The petitioner argues that counsel was ineffective in failing to adequately prepare for and conduct his sentencing hearing. Specifically, the petitioner contends that counsel did not speak with him between the conclusion of trial and the sentencing hearing, and counsel did not call any of his family members to testify at the sentencing hearing. Counsel testified that he customarily meets with clients to prepare them for the sentencing hearing and reviews the presentence investigation report with his clients; however, counsel had no independent recollection of having done so with the petitioner. Counsel believed that he spoke with the petitioner's mother about testifying at the sentencing hearing, but the petitioner was the only witness he called to testify. Counsel stated, "I want to say that I asked some of the family members if they wanted to testify at the sentencing. They didn't testify so . . . ." He claimed that it would not have been his decision to not call additional witnesses and maintained that he would have called the family members to testify if they had wanted to testify.

The post-conviction court found that counsel's decision not to call additional witnesses at the sentencing hearing was not unreasonable. We agree. The petitioner did not present proof at the post-conviction hearing regarding what further evidence additional witnesses would have provided. In fact, the petitioner admitted his testimony at the sentencing hearing covered "some" the information to which he wanted the additional witnesses testify. We further conclude that the petitioner has failed to demonstrate how he was prejudiced by his parents not testifying at his sentencing hearing.

The appellant claims that counsel was ineffective in failing to request that the trial court instruct the jury on reckless homicide, facilitation of reckless homicide, criminally negligent homicide, or facilitation of criminally negligent homicide as lesser-included offenses of first degree murder. At the post-conviction hearing, counsel testified that he requested an instruction on voluntary manslaughter, which instruction the trial court refused to give. Counsel conceded that he did not pursue instructions on any other lesser-included offenses because he believed that if the court denied his request for a voluntary manslaughter instruction, the court would also deny his request for any other lessers. Counsel acknowledged that he did not preserve the issue of any lesser-included offense, other than voluntary manslaughter, on appeal.

At the time of the petitioner's trial, the trial court was obligated to instruct the jury as to all lesser-included offenses of the charged offense regardless of whether a defendant requested such instructions. See Tenn. Code Ann. §40-18-110(a) (1997); State v. Wilson, 92 S.W.3d 391, 394 (Tenn. 2002). Based upon the trial court's duty to instruct the jury regardless of counsel's request,

this court has previously declined to find that counsel was ineffective for failing to pursue lesser-included offense instructions at trial. See Terrance L. Turner v. State, No. M2002-02429-CCA-R3-PC, 2004 WL 587636, at *5 (Tenn. Crim. App. at Nashville, Mar. 25, 2004), perm. to appeal denied, (Tenn. 2004).

Next, we turn to the petitioner's complaint that counsel was ineffective on appeal by failing to consult with the petitioner regarding appellate issues and by failing to raise on appeal the issues of lesser-included offenses and prosecutorial misconduct relating to the coercion of Hailey's false testimony. This court has previously observed,

> "[F]ailure to preserve and/or assert all arguable issues on appeal is not *per se* ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense. Counsel is not constitutionally required to argue every issue on appeal, or present issues chosen by his client. The determination of which issues to present on appeal is a matter of counsel's discretion."

State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (quoting State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)). Moreover, "[a]ppellate counsel are not constitutionally required to raise every conceivable issue on appeal." Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004).

Recently, our supreme court set forth a "non-exhaustive list" of factors which "is useful in determining whether an attorney on direct appeal performed reasonably competently in a case in which counsel has failed to raise an issue." Carpenter, 126 S.W.3d at 888. Specifically,

> 1) Were the omitted issues "significant and obvious"?
>
> 2) Was there arguably contrary authority on the omitted issues?
>
> 3) Were the omitted issues clearly stronger than those presented?
>
> 4) Were the omitted issues objected to at trial?
>
> 5) Were the trial court's rulings subject to deference on appeal?
>
> 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> 7) What was appellate counsel's level of experience and expertise?
>
> 8) Did the petitioner and appellate counsel meet and go over possible issues?

9) Is there evidence that counsel reviewed all the facts?

10) Were the omitted issues dealt with in other assignments of error?

11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Id.

Initially, we note that the petitioner failed to establish how he was prejudiced by counsel's failure to meet with him to discuss appellate issues. Therefore, his concerns in that regard are meritless. Next, we will address the petitioner's complaints about counsel's failure to preserve the issue of lesser-included offenses on appeal.

As we stated earlier, the petitioner argues that counsel should have pursued on appeal the trial court's failure to instruct the jury on reckless homicide, facilitation of reckless homicide, criminally negligent homicide, or facilitation of criminally negligent homicide as lesser-included offenses of first degree murder.[3] The post-conviction court ruled:

> Based upon the proof at trial, it is apparent that although the jury could have possibly convicted the Petitioner of one of the lesser included offenses of Reckless Homicide, Facilitation of Reckless Homicide, Criminally Negligent Homicide, or Facilitation of Criminally Negligent Homicide, no reasonable jury would have. The trial Court instructed the jury as to the lesser included offenses of Facilitation of First Degree Murder, Second Degree Murder, and Facilitation of Second Degree Murder. The State's proof was clearly sufficient to support a Second Degree Murder conviction. Therefore, even if the failure to instruct the jury on the above lesser included offenses was error, it was harmless error that did not show[] prejudice to the Petitioner with a probability sufficient to undermine confidence in the outcome of the trial.

"In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002). State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), outlines the test for determining

---

[3] On direct appeal, trial counsel pursued the issue of the trial court's failure to instruct on the lesser-included offense of voluntary manslaughter.

when an offense may be considered a lesser-included offense of an indicted offense.[4]  We note that Burns specifically designates facilitation of the charged offense as a lesser-included offense.  6 S.W.3d at 467.  Moreover, reckless homicide and criminally negligent homicide are lesser-included offenses of first degree murder.  State v. Wilson, 92 S.W.3d 391, 394 (Tenn. 2002).

"Whether or not a particular lesser-included offense should be charged to the jury depends on whether proof in the record would support the lesser charge."  Burns, 6 S.W.3d at 468. If the instruction is warranted by the evidence, the trial court must instruct the jury on all lesser-included offenses regardless of any theory proposed by either the defense or the State.  State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002).  In determining whether the lesser-included offense should be charged, "the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence."  Burns, 6 S.W.3d at 469.  We agree with the post-conviction court's finding that there was evidence at trial from which a jury could convict the petitioner of reckless homicide, facilitation of reckless homicide, criminally negligent homicide, or facilitation of criminally negligent homicide.  Therefore, it was error for the trial court not to instruct the jury on those lesser-included offenses.  Next, we turn to whether the error in omitting the instructions was harmless.

In Allen, our supreme court noted that a trial court's failure to instruct on a lesser-included offense is harmless beyond a reasonable doubt when the "omitted element was uncontested and supported by overwhelming and uncontroverted evidence."  69 S.W.3d at 189.  The evidence in this case was not uncontested or uncontroverted.  Hailey testified to the petitioner's role as an informed and active accomplice to the murder.  In his version of events, the petitioner admitted that he was present at the time of the murder, but he claimed he had no foreknowledge of the crime and had no intent to kill the victim.

Appellate courts have also previously concluded that harmless error occurs when, "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, . . . the jury necessarily rejected all other lesser offenses . . . ."  State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998).  In the instant case, the petitioner was charged with first degree murder.  The jury was instructed on the lesser-included offenses of facilitation of first degree murder, second degree murder, and facilitation of second degree murder.  The jury found the petitioner guilty of second degree murder.  Notably, in State v. Locke, 90 S.W.3d 663, 672 (Tenn. 2002), our supreme court explained that

> [f]acilitation, however, unlike lesser degrees of homicide is not an immediately lesser offense of felony murder under part (b) of the Burns test.  In fact, facilitation is a separate and distinct theory of liability from that of a principal offender or someone who is criminally responsible for the conduct of another.

---

[4]  We note that the petitioner's trial concluded on November 1, 1999, prior to the issuance of the Burns opinion.  However, the petitioner's appeal took place after the November 8, 1999, issuance of Burns.

-18-

In this case, the jury did not find the petitioner guilty of the highest charged offense to the exclusion of the lesser-included offenses. Instead, the jury found the petitioner guilty of one of the least offenses charged. Thereby, Williams does not serve to render the failure to charge the lesser-included offenses as harmless error.

Before we can declare error in failing to give an instruction on lesser-included offenses harmless, we must determine "whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." Allen, 69 S.W.3d at 191; see also Robert Gentry Galbreath v. State, No. M2003-02807-CCA-R3-PC, 2005 WL 119534, at *16 (Tenn. Crim. App. at Nashville, Jan. 19, 2005). Taking into consideration the jury's rejection of the charged offense and the contested nature of the petitioner's foreknowledge of and intent to commit the murder, we cannot say, beyond a reasonable doubt, that the jury would not have convicted the petitioner of an offense lesser than second degree murder. Allen, 69 S.W.3d at 191. Given that the we are unable to say beyond a reasonable doubt that the omission of lesser-included offense instructions did not affect the outcome of the trial, we are constrained to find that the error was not harmless. Id. at 191-92.

In sum, we conclude that the trial court should have instructed the jury on the lesser-included offenses reckless homicide, facilitation of reckless homicide, criminally negligent homicide, or facilitation of criminally negligent homicide, and the error in failing to give such instructions was not harmless. We conclude that counsel was deficient in failing to raise the issue on appeal, and the petitioner was prejudiced by this deficiency. Thus, the petitioner is entitled to relief on this issue.

The petitioner also contends that trial counsel was ineffective in failing to raise the issue of prosecutorial misconduct and witness tampering on appeal. These issues center around the petitioner's claim that the State coerced Hailey into giving false testimony against him at trial. At the post-conviction hearing, the petitioner testified that he overheard the State pressuring Hailey into testifying. Assistant District Attorney Bret Gunn testified that Hailey was supposed to testify as a condition of his plea agreement. Gunn asserted that Hailey was free to not testify; however, had he done so, his plea agreement would have been nullified. Gunn stated that Hailey never told him that his testimony would be untruthful. Yarbrough, Hailey's attorney, testified that Hailey did not want to testify against the petitioner because they were friends, but Hailey never claimed that his testimony would be untruthful. The post-conviction court found that the State engaged in no prosecutorial misconduct. Therefore, counsel was not ineffective in this regard. We can find no evidence in the record to preponderate against the post-conviction court's finding.

## 2. Prosecutorial Misconduct

The petitioner argues that the State committed prosecutorial misconduct by improperly influencing Hailey, by intentionally eliciting testimony regarding the suicide of the victim's wife, and by eliciting Dr. Gerber's opinion on the blood spatter in the petitioner's trunk. We note that these issues are more properly the subject of direct appeal; as such, they are waived in the post-conviction setting. See Tenn. Code Ann. § 40-30-106(g). Regardless, we conclude that the State committed no prosecutorial misconduct entitling the petitioner to relief.

## C. Jury Instructions

As his final post-conviction issues, the petitioner argues that the trial court erred in not instructing the jury on reckless homicide, facilitation of reckless homicide, criminally negligent homicide, and facilitation of criminally negligent homicide as lesser-included offenses of first degree murder. The petitioner also claims that the trial court erred in defining the mental state of "knowingly" in connection with second degree murder. We note that these issues are more properly the subject of a direct appeal and are not properly issues for post-conviction relief. See Tenn. Code Ann. § 40-30-106(g).

## B. Writ of Error Coram Nobis

Next, we turn to the petitioner's argument that he is entitled to a writ of error coram nobis based upon Hailey's recanted testimony. Tennessee Code Annotated section 40-26-105 (2003) provides:

> There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith . . . . Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

It is well-established that the writ of error coram nobis "is an *extraordinary* procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999). Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

We note that a petition for a writ of error coram nobis must be filed within one year of the judgment becoming final in the trial court. Tenn. Code Ann. § 27-7-103 (2000). "A judgment becomes final in the trial court thirty days after its entry if no post-trial motions are filed. If a post-trial motion is timely filed, the judgment becomes final upon entry of an order disposing of the post-trial motion." Mixon, 983 S.W.2d at 670. The petitioner's petition for a writ of error coram nobis was filed on July 20, 2004, well outside the statute of limitations. The petitioner concedes that the petition was untimely, but he asks us to toll the statute of limitations because of due process concerns. We conclude that due process does not require tolling; however, we will briefly address the merits of the petitioner's claims. See Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001).

Under certain circumstances, recanted testimony may be considered newly discovered evidence. See Mixon, 983 S.W.2d at 672. This court has concluded that a trial court should only grant a writ of error coram nobis upon the basis of newly discovered recanted testimony if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

State v. Ratliff, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing Mixon, 983 S.W.2d at 673 n. 17).

Additionally, any affidavit supporting a petitioner's claim "must be relevant, material and germane to the grounds raised in the petition; and the affiant must have personal knowledge of the statements contained in the affidavit." Hart, 911 S.W.2d at 375. Should an affidavit fail to meet these criteria, no evidentiary hearing should be granted since the information, even taken as true, would not warrant relief. Id. Furthermore, cumulative evidence will also not justify the grant of a writ of error coram nobis. Id.

As we stated earlier, the petitioner's post-conviction counsel, Tucker, questioned Hailey approximately four years after the conclusion of the petitioner's trial. In response to Tucker's questions, Hailey stated that the petitioner did not plan the killing with him because "[i]t was a spur of the moment shooting." Hailey denied that he and the petitioner ever discussed killing the victim. Hailey maintained that the petitioner knew that he had a gun on the night of the shooting, but the petitioner did not know the reason Hailey had the gun. Hailey stated that the petitioner went into the water with the victim, but Hailey did not see the petitioner hold the victim's head under the water. Hailey explained, "I told the police he participated because I thought he was telling on me." Hailey asserted that he "will not testify in court in this matter." Hailey answered the questions in the presence of private investigator Dan Hodges. Hodges handwrote Hailey's answers, and Hailey signed and dated the responses.

The trial court issued an order dismissing the petitioner's petition for a writ of error coram nobis. The trial court explained that the four-year delay between the finality of the judgment and the filing of the petition for the writ of error coram nobis was not attributable to the fault of the petitioner's counsel; regardless, the delay was beyond the statute of limitations. Generally, to determine whether due process requires tolling the statute of limitations, a trial court must determine whether the governmental interests involved outweigh the private interests affected by the official action. Workman, 41 S.W.3d at 102 (citing Burford v. State, 845 S.W.2d 204, 207 (Tenn. 1992)). Typically, the government has an interest in preventing the litigation of stale and groundless claims. Id. at 103. The petitioner has a private interest in having a hearing on the "newly discovered

evidence" which he claims may have resulted in a different verdict at trial. <u>Id.</u> From our review of the record, we note that the trial court did not apply the balancing test found in <u>Burford</u> and <u>Workman</u> to determine whether due process required tolling of the statute of limitations. Regardless, we agree with the substantive facts found by the trial court.

The trial court found that Hailey's statements, even if taken as true, did not exculpate the petitioner and would not have resulted in a different verdict at trial. Accordingly, the court determined that due process concerns did not mandate that the statute of limitations be tolled. The record reflects that Hailey's answers to counsel's questions did not consist of a complete recantation of his trial testimony. Further, the evidence adduced at the hearing on the motion to dismiss reflects that Hailey consistently said that he would not testify as to the version of events he told the petitioner's counsel. Therefore, we conclude that the post-conviction court did not abuse its discretion in denying the petitioner's petition for a writ of error coram nobis.

### III.  Conclusion

We affirm the post-conviction court's denial of a petition for a writ of error coram nobis, but we reverse the denial of post-conviction relief and remand for a new trial.

_____

NORMA McGEE OGLE, JUDGE